UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THOMAS W. SEITER,

    Plaintiff,

    v.

YOKOHAMA TIRE CORPORATION, a Delaware Corporation,

    Defendant.

Case No. C08-5578 RBL

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT YOKOHAMA TIRE CORPORATION'S MOTION FOR SUMMARY JUDGMENT

    This is an employment action wherein Plaintiff Thomas Seiter has sued Yokohama Tire Corporation (YTC) for wrongful termination, alleging that YTC retaliated against him in response to a series of tire safety and warranty fraud complaints he lodged with his employer over the final year of his employment. Plaintiff alleges a constructive discharge in violation of public policy and/or in violation of YTC's promises of specific treatment, discrimination based on disability (dyslexia), and that YTC violated Washington wage statutes.

    Presently before the Court is Defendant YTC's motion for summary judgment seeking dismissal of Plaintiff's claims in their entirety. The Court, having reviewed the pleadings and record herein, is fully informed and hereby GRANTS IN PART and DENIES IN PART the motion for summary judgment.

ORDER - 1

**Introduction and Background**

Yokohama Tire Corporation is the North American affiliate of an international tire manufacturer. YTC has operated in the United States for over forty years and sells tires through over 4,500 points of sale. Seiter began working for YTC in 1987 and stayed with YTC until December 2007. Initially, Seiter worked for YTC as a salesman in the Midwest; he then transferred to the Pacific Northwest in 2001 to take over a new sales area. His last position with YTC was as Senior District Representative and his job duties consisted of selling tires to national accounts, either to large clients with fleets, such as trucking companies, or wholesale dealers who would sell the tires directly to customers.

Seiter suffers from dyslexia and was diagnosed in early childhood. YTC executives were aware of Mr. Seiter's learning disability and commented in his performance evaluations that he continually struggles with communication in his writing abilities and that because of his disability he "does things a bit different than the rest of us." Seiter asserts that due to his disability, he was denied promotions in the 1990s while working in the Midwest.

YTC maintains a "Code of Ethics" which places an affirmative duty on employees to report ethical violations. Employees who violate the provisions of the Code may be subject to disciplinary action, up to and including dismissal. The Code prohibits unlawful discrimination and/or harassment by any employee of YTC. Upon receipt of a complaint of harassment or discrimination, YTC is required to immediately undertake an effective, thorough and objective investigation of the allegations and if warranted, take remedial action to deter future harassment or discrimination. The Code prohibits retaliation against an employee for reporting in good faith incidents of discrimination or harassment. Any employee who retaliates against another for making a complaint is subject to disciplinary action, up to and including termination.

The Code also requires employees to report any unethical, dishonest or illegal conduct reasonably suspected to have been committed by another YTC employee. Any form of retaliation

ORDER - 2

directed at an employee who notifies YTC of a suspected violation of the Code is prohibited.

The Code provides that it is not a contract of employment and as an employee of YTC subject to the Code, employment is "at will" and YTC is free to terminate employment at any time for any reason or no reason.

YTC has a Business Expense and Reimbursement Policy Number 10106 (Expense Policy), that was last revised on December 15, 2003. The Expense Policy was introduced to ensure that employees properly recorded their reimbursable business expenses. The Expense Policy applies to all employees and explains that expense reports should present the facts fully and clearly, and that all expenditures must be supported with original receipts. The Expense Policy also requires that expenditures for business meals have an explanation of the date, business relationship, place, purpose, amount and number of employees attending.

Prior to 2006, YTC had never strictly enforced its expense reporting policies. On January 19, 2006, Jim MacMaster, who was Vice President of Sales for the Business Division at the time, emailed all business division directors a copy of the Policy and requested that they begin enforcing it more strictly in an effort to reduce company waste. On June 18, 2007, Koji Kanemoto, Director of Internal Audit, sent a company-wide email noting that employees should "always retain the original receipt which shows in detail what you purchased or ate and submit that in support of your reimbursement request for all expenses, whether paid for in cash or charged." Following this, on August 8, 2007, the Company President and CEO issued a memorandum to all staff explaining that past expense reporting practices were unacceptable and the Expense Policy must be adhered to. This Company wide memo informed all YTC employees that an audit had uncovered an alarming pattern of abuse and fraud, that employees should not "pad, create, misuse or otherwise alter true receipts," that YTC would continue to sample expense reports, and employees should be aware that they may be audited.

ORDER - 3

In the summer of 2006, Seiter reported to YTC management concerning customer complaints regarding a YTC tire. Seiter reported that he was getting two to three calls a week on model MY507A tires being out-of-round. Seiter stated that they had been aware of this problem for over 17 months and the problem is getting worse and that some truck drivers felt it was unsafe to drive with these tires. Seiter stated that YTC "better be careful on this problem if there is an accident with this MY507A, [the company] could be held liable for not fixing the problem."

CFO Jim MacMaster replied to Seiter stating:

> I completely understand the frustration that you and truck tire division are experiencing over the out of round conditions that have existed and continue to exist on the MY507A. However, using the terminology of "unsafe" is both incorrect and dangerous it is purely editorializing a situation as out of round is "not" a safety issue. By trying to bring attention to this in this fashion you are potentially exposing the company and individuals in the company to potential criminal proceedings under the TREAD act doctrine.
>
> The only advice I can provide to Lou and Tom under the circumstance is to correctly handle any customer complaints and provide a fair compensation until the root cause can be determined and the problem eliminated. In the interim you should stop selling the tire into the market if it is creating so much damage to the image and reputation of you and our company. In the future please refrain from making inflammatory comments of which could result in personal jeopardy of you and others.

Seiter considered this response an overt threat and stern directive for Seiter to keep quiet about events that could trigger TREAD Act[1] reporting or penalties, and if he refused then he would suffer the consequences. Customers continued to bring forward safety concerns and Seiter continued to raise those safety issues with management.

Soon, another YTC tire, the MJOI, also began experiencing similar problems, only much worse (extreme tread failure including severe cracking and severe rib tearing). Seiter began

---

[1] The TREAD Act was passed by Congress in 2000 and has been incorporated into the existing National Traffic and Motor Vehicle Safety Act of 1966 (NHTSA), codified at 49 U.S.C. §§ 30101-30170. The "Early Warning" requirements of the TREAD Act mandate that a tire manufacturer report recalls, warranty and customer satisfaction claims. The "Early Warning" requirement enables the NHTSA to collect data, notice trends, and warn consumers of potential defects in vehicles.

ORDER - 4

documenting in company records that the failures constituted "A code" safety and warranty defects. However, in spring of 2007, Seiter began noticing that his A code designations were being changed to more benign "B-codes;" the change to a B code signifying that the problems were now being recorded as mere "customer satisfaction" issues rather than the previously flagged safety and warranty defect issues that may trigger TREAD Act reporting. In order to substantiate his complaints, Seiter took a series of photos of the rib tearing, showing the tread literally peeling off, and forwarded them to his managers as email attachments.

Contemporaneously with Seiter's reporting of the tire safety and warranty issues, he became the subject of a "routine random audit" of his business expense reports. Although the final audit report indicates that Seiter's expense records were but one of 15 employee records randomly selected for audit, Seiter states that he was informed by YTC's Director of Internal Audit, Koji Kanemoto, that he was being audited because Kanemoto's direct supervisor at the time, YTC President Nono Karashima, had instructed him to specifically audit Seiter.

Seiter responded to the audit in August 2007 with a lengthy explanation of his expense reporting. Seiter explained that his records were somewhat in disarray due to his dyslexia. The audit did not find anything out of order with Seiter's travel and lodging expenses. The audit did raise concerns regarding meal expense reports where the receipts had the bottom or top cut off. Seiter explained that he cut the receipts so that he could roll legitimate expenses into a meal allowance, including items such as snacks and soft drinks. He further stated that when informed that this was an inappropriate procedure, he quit tearing the tops off of the receipts.

The YTC auditor was apparently dissatisfied with Seiter's explanation and requested Seiter provide YTC with his credit card history for the 2007 fiscal year. Seiter became concerned that the audit was being conducted in response to his reporting of the safety and warranty concerns with the MY507 and MJO1 tires. Seiter expressed his concerns to the Director of Human Resources, Steve Kessing. Kessing responded, stating that the audit was confined to expense issues and that he was

ORDER - 5

unaware of the warranty and safety issues raised by Seiter. Kessing again requested Seiter provide the credit card statements to verify his expenses and his failure to do so by November 7, 2007, would result in the Company concluding the investigation with the information it had.

Seiter responded on November 7, 2007. He told Kessing that he would not provide his credit card statements and that his dyslexia caused him to make mistakes in recording the correct dates more than he would have liked. He also said he felt the decision to fire him or get him to quit had already been made.

Seiter states that employees had been in contact, letting him know that the word was out that he would soon be fired.

A Vice President of Sales, Dan King, had responded to a message from Seiter expressing empathy with Seiter and acknowledging that the audit procedure he was subject to was a hassle and might even be viewed as an invasion of privacy. He recognized that there had been much confusion on the proper procedure for expense reporting in the past. He then emphasized that the auditor simply needed to review his credit card statements so that they could match the record with his receipts. King indicated that the company needed to understand Seiter's situation and then they could move past this issue and focus on selling product, at which Seiter was one of the best.

In a subsequent message, Dan King informed Seiter that he could not help Seiter regarding the audit and that Seiter was on his own.

During the course of a nearly five month investigation, the auditor, Koji Kanemoto, made statements which led Seiter to believe that he was being accused of engaging in fraud and deceit. During this period, Seiter had lodged at least three complaints under the Company Code of Ethics reporting that he felt he was being retaliated against because of his safety and warranty fraud complaints. Those complaints went to his Zone Manager, Lou Kardonsky, and Director of Human Resources, Steve Kessing.

On November 19, 2007, Seiter sent letters to Kessing and Kardonsky notifying them that

ORDER - 6

he was resigning. Seiter's letter of resignation was accompanied by his physician's recommendation that he seek other employment to reduce stress levels. Seiter stated in his resignation letter that he felt that YTC was seeking to pressure his resignation and conducted the audit of his expense reports in retaliation for his reporting of tire safety concerns.

YTC responded to Seiter's resignation letter stating it deeply regretted his decision to leave the company rather than cooperate with the expense audit. The response further indicated that the audit had nothing to do with his raising tire safety concerns.

Seiter then commenced suit on August 26, 2008 in Superior Court for Clark County, Washington. Defendant YTC removed the action to this Court on September 25, 2008.

## Summary Judgment Standards

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987).

When considering a summary judgment motion, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, at 248. These inferences are limited, however, "to those upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1220 (9th Cir. 1995). Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a

ORDER - 7

showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. Celotex, at 322-23. Rule 56(e) compels the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere allegations or denials of [the party's] pleading." The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party. Anderson, at 249. Summary judgment is warranted if the evidence is "merely colorable" or "not significantly probative." Id. at 249-50. The nonmoving party must identify with reasonable particularity the evidence that precludes summary judgment. Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

The Ninth Circuit has consistently set a high standard for the granting of summary judgment in employment discrimination cases. Schnidrig v. Columbia Mach., 80 F.3d 1406, 1410 (9th Cir. 1996). Because employment cases are so often fact intensive, courts have consistently found that summary judgment in favor of employers is seldom appropriate in employment cases. See e.g., McGinest v. GTE Service Corp., 360 F.3d 1104, 1112 (9th Cir. 2004). A plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment." Chuang v. University of CA. Davis Bd of Trustees, 225 F.3d 1115, 1124 (9th Cir. 2000).

**Constructive Discharge**

In an action for wrongful discharge, the discharge may be either express or constructive. To establish a claim for constructive discharge, a claimant must show: (1) that the employer deliberately made the working conditions intolerable for the claimant; (2) that a reasonable person in the claimant's position would be forced to resign; (3) that the claimant resigned solely because of the intolerable conditions; and (4) that the claimant suffered damages. Haubry v. Snow, 106 Wn. App. 666, 677, 31 P.3d 1186 (2001).

ORDER - 8

A claimant may show conditions are intolerable by demonstrating aggravating circumstances or a continuous pattern of discriminatory treatment. Id. Whether working conditions are intolerable is a question of fact and is not subject to summary judgment unless there is no competent evidence to establish the claim. Id. at 677-78; See also, Bulaich v. AT&T Info. Sys., 113 Wn.2d 254,261-62, 778 P.2d 1031 (1989); Wahl v. Dash Point Family Dental Clinic, Inc., 144 Wn. App. 34, 44, 181 P.3d 864 (2008). Conditions taken together may establish a pattern of treatment that was intolerable. Again, these factual questions are for the jury. Allstot v. Edwards, 116 Wn. App. 424, 434 65 P.3d 696 (2003).

An employee who is forced to permanently leave work for medical reasons may have been constructively discharged. Deliberately creating conditions so intolerable as to make the employee so ill that he or she must leave work permanently is functionally the same as forcing the employee to quit. Korslund v. DynCorp Tri-Cities Servs., 156 Wn.2d 168, 180; 125 P.3d 119 (2005).

The Court finds that Plaintiff has raised a material issue of fact as to whether he was constructively discharged from employment. Plaintiff has introduced sufficient evidence to raise a jury issue as to whether YTC's audit of his expenses was conducted in retaliation for Plaintiff's submitting complaints regarding the safety of the MY507A and MJ01 tires, that YTC deliberately made Plaintiff's working conditions intolerable, that Plaintiff resigned due to intolerable working conditions, and he suffered damages.

Nonetheless, the general rule in Washington is an employer has the right to discharge an employee, with or without cause, in the absence of a contract for a specified period of time. Snyder v. Medical Service Corp. of Eastern, 145 Wn.2d 233, 238, 35 P.3d 1158 (2001); Roberts v. Atl. Richfield Co., 88 Wash.2d 887, 891, 568 P.2d 764 (1977). Accordingly, there is no cause of action for a constructive discharge unless it is wrongful.

ORDER - 9

**Promise of Specific Treatment In Specific Circumstances**

Washington has recognized an exception to at-will employment when a company handbook or policy establishes "promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship" Korslund v. DynCorp Tri-Cities Services, Inc, 156 Wn. 2d 168, 184, 125 P.3d 119 (2005). Promises of specific treatment in specific circumstances are enforceable against the employer when the employee relies upon the promises in a handbook and the promises are breached by the employer. Hollenback v. Shriners Hospitals for Children, 149 Wn.App. 810, 826, 206 P.3d 337 (2009); Bulman v. Safeway, Inc., 144 Wn.2d 335, 354, 27 P.3d 1172 (2001). However, where the employee handbook gives the employer discretion when applying disciplinary procedures, the manual does not provide a promise of specific treatment in a specific circumstance. Hollenback, at 826; Drobny v. Boeing Co., 80 Wn.App. 97, 103, 907 P.2d 299 (1995).

In order for an at-will employee to prevail on this claim of wrongful employment termination on the basis of statements in the employer's policy manual, the employee must prove: (1) that the statements in the policy manual amounted to promises of specific treatment in specific situations; (2) that the employee justifiably relied upon any such promise; and (3) that the promise of specific treatment was breached. Bulman v. Safeway, Inc., 144 Wn.2d 335, 344, 27 P.3d 1172 (2001). Whether an employment policy manual contains a promise of specific treatment in specific situations, whether the employee justifiably relied on the promise, and whether the promise was breached are questions of fact, and only if reasonable minds could not differ in resolving these questions is it proper for the trial court to decide them as a matter of law. Klontz v. Puget Sound Power & Light Co, 90 Wn.App. 186, 190, 951 P.2d 280 (1998).

YTC maintains a "Code of Ethics" which places an affirmative duty on employees to report ethical violations. The Code requires employees to report any unethical, dishonest or illegal

ORDER - 10

conduct reasonably suspected to have been committed by another YTC employee. Any form of retaliation directed at an employee who notifies YTC of a suspected violation of the Code is prohibited.

The Code further provides that it is not a contract of employment and as an employee of YTC subject to the Code, employment is "at will" and YTC is free to terminate employment at any time for any reason or no reason.

Seiter alleges that the Code provides a specific promise that he would not be retaliated against for raising his concerns about tire safety. The promise prohibiting retaliation concerns employee notification of suspected violations of the Code, which in turn prohibits unethical, dishonest or illegal conduct.

Although a close question, the Court finds that Plaintiff has raised a genuine issue of fact as to whether YTC breached a promise prohibiting retaliation in regards to Plaintiff reporting tire safety concerns to management. See Korslund v. Dyncorp Tri-Cities Services, Inc., 156 Wash.2d 168, 130-31, 125 P.3d 119 (2005) (question of fact remained, precluding summary judgment in employees' action against employer for breach of promise of specific treatment in specific situations, as to whether employer's non-retaliation policies expressed in employee manual on resolving employees' concerns and reporting ethical violations constituted promises to employees).

Defendant's Motion for Summary Judgment on Plaintiff's Second Cause of Action: Wrongful Termination - Code of Ethics is **DENIED**.

## Termination in Violation of Public Policy

Generally, absent a contract requiring cause for termination, employment relationships in Washington are at-will by either employer or employee. Thus, under the at-will doctrine, an employer can with limited exceptions discharge an employee with immunity. Bakotich v. Swanson, 91 Wn.App. 311, 314, 957 P.2d 275 (1998); Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 232, 685 P.2d 1081 (1984).

ORDER - 11

One of the narrow exceptions to the at-will rule is for a violation of public policy. Sedlacek v. Hillis, 145 Wn.2d 379, 385, 36 P.3d 1014 (2001). The tort of wrongful discharge in violation of public policy is a narrow exception to this employment at-will doctrine. Id. In order to prevail on a claim under the tort of wrongful discharge in violation of public policy, a plaintiff must prove the following three elements: (1) that a clear public policy exists (the "clarity" element); (2) that discouraging the conduct in which the employee engaged would jeopardize the public policy (the "jeopardy" element); and (3) that the employee's public-policy-related conduct caused the dismissal (the "causation" element). Brundridge v. Fluor Federal Services, Inc., 164 Wn.2d 432, 440, 191 P.3d 879 (2008); Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 941, 913 P.2d 377 (1996).

The Court finds that Plaintiff has failed to raise a material fact to establish the clarity element necessary to support his wrongful termination in violation of public policy claim and it fails. A disagreement over policy or a course of action, even one based on a good faith belief, does not make a proposed action illegal for purposes of the tort of wrongful discharge. A clear public policy is not founded upon the subjective belief of an employee. The public policy at issue must be one that has been either legislatively or judicially recognized.

In determining a wrongful termination in violation of public policy, Washington statutes and case law provide the primary sources for public policy, but other sufficient sources of public policy may be found in federal law in order to satisfy the clarity element. Anica v. Wal-Mart Stores, Inc., 120 Wn.App. 481, 495-96, 84 P.3d 1231 (2004). "Whether a particular statute contains a clear mandate of public policy is a question of law." Hubbard v. Spokane County, 146 Wn.2d 699, 708, 50 P.3d 602 (2002). The plaintiff bears the burden of showing that the dismissal violates a clear mandate of public policy. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984). Thus, to avail himself of the narrow constructive discharge exception to the terminable-at-will doctrine, an employee must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened. Snyder v. Medical Serv. Corp.

ORDER - 12

of Eastern Washington, 145 Wn.2d 233, 239, 35 P.3d 1158 (2001).

Plaintiff asserts that the public policy element of his claim is provided for in the TREAD Act incorporated into the National Traffic and Motor Vehicle Safety Act of 1966, codified at 49 U.S.C. § 30101-30170. Plaintiff asserts that he has offered ample evidence that YTC's executives knew that their actions were contrary to the TREAD Act, and that tire safety and warranty complaints triggered TREAD Act reporting, and despite the danger to commercial truck drivers, YTC ignored the complaints because they could harm YTC's reputation in the market place.

The Court disagrees. Other than providing a broad statement of the purpose of the TREAD Act, the Plaintiff has failed to provide any evidence that the TREAD Act has application to YTC's actions. In contrast, Defendant has responded with citation to authority that provides that there is no TREAD Act reporting requirement with respect to commercial truck tires under the circumstances of which Plaintiff was reporting; i.e. incidents not involving death or injury. See 49 C.F.R. § 579.26. Thus, Plaintiff has failed to establish the first element (clarity) of a claim of termination in violation of public policy and YTC is entitled to summary judgment on this claim.

Defendant's Motion for Summary Judgment on Plaintiff's First Cause of Action: Wrongful Termination - Violation of Public Policy is **GRANTED**.

## Disability Discrimination

To establish a prima facie case for disability discrimination under a failure to reasonably accommodate theory, Plaintiff must prove that: (1) he had a sensory, mental, or physical abnormality that substantially limited his ability to perform his job; (2) he was qualified to perform the essential functions of the job in question; (3) he gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 193, 23 P.3d 440 (2001).

ORDER - 13

An employer does not owe a duty to accommodate until after the employer becomes aware of the employee's disability and physical limitations. Moreover, the employee bears the burden of giving notice of his disability to his employer. Goodman v. Boeing Co., 127 Wn.2d 401, 408, 899 P.2d 1265 (1995).

Plaintiff suffers from dyslexia, a recognized disability under the ADA. See Vinson v. Thomas, 288 F.3d 1145, 1153-54 (9th Cir. 2002).

Plaintiff asserts that YTC was on notice of his disability, denied him promotional opportunities because of his disability, and failed to take his disability into account during the audit of his business expenses.

The Court disagrees. Although it may be said that YTC had notice of Plaintiff's dyslexia, Plaintiff has not presented any evidence of a denial of promotional opportunities or that his dyslexia prevented Plaintiff from responding to the audit of his business expenses. It further appears that any claim for discrimination in denial of promotional opportunities in the 1990's would be barred by the statute of limitations. YTC is entitled to summary judgment on the claim of disability discrimination.

Defendant's Motion for Summary Judgment on Plaintiff's Third Cause of Action: Disability Discrimination is **GRANTED**.

**Wage Claim**

When an employee ceases to work for an employer, the employer must pay the employee the wages due to him or her. RCW 49.48.010. If the employer fails to do so, the employee may bring a cause of action to recover the amount owed and is entitled to attorney fees. RCW 49.48.030. Under RCW 49.52.070, double damages are appropriate when the employer's nonpayment of wages is willful and not the result of a bona fide dispute over the employer's obligation to pay. Chelan County Deputy Sheriffs' Ass'n v. Chelan County, 109 Wash.2d 282, 300, 745 P.2d 1 (1987).

ORDER - 14

Plaintiff asserts that when responding to the company audit of his expenses, he discovered a miscalculation of reimbursement for lodging in his favor in the amount of $306.50, which he claims as unpaid wages. Plaintiff has not supported this claim with any credible evidence. Nor has this Court been presented with any legal authority that the reimbursement of travel expenses is a "wage" for the purposes of Washington's wage statutes.

Other than Plaintiff's self-serving declaration, Plaintiff has failed to support this alleged wage loss with credible evidence. There is no evidence that this specific amount of wages, or any, are owed Plaintiff based on an assertion of his own error in his record keeping. The wage claim is subject to summary judgment.

Defendant's Motion for Summary Judgment on Plaintiff's Fourth Cause of Action: Violation of Washington Wage Statutes is **GRANTED**.

## Conclusion

For the above stated reasons, Defendant Yokohama Tire Corp's Motion for Summary Judgment [Dkt. # 42] is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's First Cause of Action: Violation of Public Policy is **DISMISSED**. Plaintiff's Third Cause of Action: Disability Discrimination is **DISMISSED**. Plaintiff's Fourth Cause of Action: Violation of Wage Statutes is **DISMISSED**.

DATED this 3rd day of February, 2010.

*/s/ Ronald B. Leighton*
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER - 15